**IN THE COURT OF APPEALS OF IOWA**

No. 19-0890
Filed September 2, 2020

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**RODNEY C. HENRICKSEN,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Jeffrey Farrell, Judge.


        Rodney Henricksen appeals his conviction of murder in the second degree.

**AFFIRMED.**


        Martha J. Lucey, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Zachary Miller, Assistant Attorney General, for appellee.


        Considered by Doyle, P.J., Mullins, J., and Mahan, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2020).

**MAHAN, Senior Judge.**

Rodney Henricksen appeals his conviction of murder in the second degree, raising claims with regard to his justification defense and the admission of testimony from a lip-reading expert. Upon our review, we affirm.

## I. *Background Facts and Proceedings*

On the evening of January 17, 2018, a violent altercation between Henricksen and Joshua Sadlon broke out in a crowded Urbandale bar. Sadlon appeared to be unconscious after Henricksen threw him onto a table and landed several punches to his face. Sadlon was pronounced dead the following day.

The State filed a trial information charging Henricksen with murder in the second degree. Henricksen pled not guilty and later filed a notice of justification defense pursuant to the "stand your ground" amendments to chapter 704 (2018). He requested a pretrial evidentiary hearing on his claim of statutory immunity. Following a hearing, the district court denied Henricksen's request.

Prior to trial, Henricksen moved to exclude testimony from a lip-reading expert regarding what she saw Henricksen say in audio-less surveillance videos from the bar on the night of the altercation. The district court ruled to allow the testimony.

The case proceeded to trial. At the close of the State's case, Henricksen moved for judgment of acquittal, claiming the State failed to prove he lacked justification. The district court denied the motion. The jury found Henricksen guilty as charged. The district court denied Henricksen's motion for new trial and arrest of judgment. The court sentenced Henricksen to an indeterminate term of

imprisonment not to exceed fifty years with a seventy percent mandatory minimum. Henricksen appealed. Facts specific to his claims on appeal will be set forth below.

## II.      *Expert Lip-Reading Testimony*

Henricksen appeals the district court's decision to allow Telina Quintana to provide testimony as an expert witness on lip reading. We review evidentiary rulings, including the admission of expert testimony, for abuse of discretion. *State v. Tyler*, 867 N.W.2d 136, 152 (Iowa 2015). "Iowa is generally 'committed to a liberal view on the admissibility of expert testimony.'" *Id.* at 153 (citation omitted). A qualified expert "may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Iowa R. Evid. 5.702. "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Iowa R. Evid. 5.703.

The State explored Quintana's qualifications at trial. Quintana testified she "was born deaf" and had been reading lips for forty-four years. When she did not have an interpreter, Quintana relied on lip reading, writing notes, and gesturing to communicate, including during high school, college, and her employment. Quintana had not testified in court as a lip reader before. She stated, "General research shows that the average deaf person can understand when they're lip reading about thirty percent, depending on their background, depending on where they went to school, depending on environment." But she opined "[t]hat percentage would increase" if she was able to "see what the person was saying over and over."

Quintana was provided copies of the surveillance video zoomed in to 150 percent and 200 percent, as well copies in color and black and white. She testified "[t]he closeup was much clearer" because she "was able to see their lips better," and "[t]he black and white was definitely easier to lip read." Quintana spent "sixty hours" reviewing the video. She testified she saw Henricksen say "Go home" twice and "I want to beat him" twice. Quintana also testified she did not see Sadlon threaten Henricksen, but she acknowledged she "was better able to lip read [Henricksen]" than Sadlon because Sadlon's face was "dark" and he had a beard.

Henricksen challenges the reliability of Quintana's testimony, "due to her lack of qualifications and the lack of any standards for assessing the accuracy of lip reading in general or Quintana's lip reading in particular." As noted, Quintana acknowledged that general studies showed that "lip-reading is about thirty percent reliable," but she believed her review of the video was "approximately eighty percent" accurate. Quintana also acknowledged that she had no "formal training in lip-reading" and "no way of verifying" if what she transcribed from the video was correct, but she explained her procedure of lip-reading the video in this case as follows: "I would write it down. And then I would watch it again to make sure it was clear that I got it. And I would document it, and then I would watch it again and make sure, verify, that that is, indeed, what I caught." She further testified, "I wanted to make absolutely sure that the word that I caught, that I understood from what they said was, indeed, the word that was out of their mouth. It's important to me that I was accurate."

Despite Henricksen's concerns, we conclude the record demonstrates Quintana was qualified to testify about her lip-reading of the surveillance video.

*See Estate of Williams v. City of Milwaukee*, 274 F. Supp. 3d 860, 879 (E.D. Wis. 2017) (holding an expert lip reader was able to reliably transcribe thirty seconds of audio-less squad car footage considering the expert's "lifetime of practice and decades of professional lip-reading" and stating that any concerns about accuracy could be addressed on cross-examination by the defense), *vacated on other grounds*, 902 F.3d 643 (7th Cir. 2018); *see also State v. Belken*, 633 N.W.2d 786, 800 (Iowa 2001) (noting "witnesses may acquire expert knowledge through practical experience and training"); *State v. Buller*, 517 N.W.2d 711, 714 (Iowa 1994) (finding years of experience and training with dog qualified dog handler as expert witness regarding dog's reactions); *cf. Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 686 (Iowa 2010) (observing "the foundational showing of reliability for nonscientific evidence is correspondingly lower" than that required for scientific evidence that is "particularly novel or complex"). The video quality was clear, and we believe the facial images were detailed enough to allow Quintana an accurate description of certain statements, particularly upon sixty hours of review. *But see Quinn v. Pipe & Piling Supplies (U.S.A.) Ltd.*, No. 2:09-CV-161, 2011 WL 13124629, at *2 (W.D. Mich. Mar. 21, 2011) (declining to opine on "the admissibility of lip reading evidence generally," but concluding the proposed lip-reader testimony "would not be reliable in this case due to the nature of the video," including "generally poor" video quality and "highly variable" speed, which produced "distortion"). And contrary to Henricksen's contention that "[b]ecause the lip reading testimony was inherently unreliable, it was also unhelpful to the jury and irrelevant," we conclude the testimony was helpful for the trier of fact in understanding the evidence. *Belken*, 633 N.W.2d at 799 ("As a general rule, we

permit expert testimony if it consists of specialized knowledge that will aid the jury in understanding the evidence or in deciding a material issue."). An absence of certainty does not render the testimony inadmissible. *See Tyler*, 867 N.W.2d at 153 ("A lack of absolute certainty goes to the weight of the expert's testimony, not to its admissibility." (citation omitted)). We find no abuse of discretion in the district court's decision to allow the expert testimony at issue.

### III. *Justification Defense*

Henricksen acknowledged striking Sadlon but claimed he acted in self-defense because he was in fear of his life. On appeal, Henricksen claims "the State failed to disprove his defense of justification" where "[t]he evidence established that Henricksen had a reasonable belief that his use of force against Sadlon was reasonable and necessary to prevent the imminent and unlawful use of force by Sadlon." We review a challenge to the sufficiency of the evidence for the correction of errors at law. *See State v. Serrato*, 787 N.W.2d 462, 465 (Iowa 2010). The jury's verdict will be upheld if it is supported by substantial evidence. *See State v. Henderson*, 696 N.W.2d 5, 7 (Iowa 2005).

The jury received the following marshalling instruction on Henricksen's justification defense:

> The Defendant claims he acted with "justification." A person is "justified" in the use of reasonable force when the person reasonably believes that such force is necessary to defend oneself from any actual or imminent use of unlawful force.
> A person who reasonably believes that a forcible felony is being or will imminently be perpetrated is justified in using reasonable force, including deadly force, against the perpetrator to prevent or terminate the perpetration of that felony.
> The State must prove at least one of the following elements to show that Defendant was not justified:

        1. The Defendant provoked the use of force against himself with the intent to use such force as an excuse to inflict injury on the other person.

        2. The Defendant did not believe he was in imminent danger of death or injury and the use of force was not necessary to save him.

        3. The Defendant did not have reasonable grounds for the belief.

        4. The force used by the Defendant was unreasonable.

        The State has the burden to prove the Defendant was not acting with justification.

*See* Iowa Code § 704.3 (2018).

At trial, Henricksen testified that Sadlon made several threats to him, including making a "gun gesture" under Henricksen's chin, asking who the women in Henricksen's group were there with, and telling Henricksen he had "been in a lot of fights, he could kick my ass any time he wanted to."  Henricksen testified that he told his friend, Davy Thomsen, that Sadlon "just threatened my life."  Henricksen testified that Sadlon's statement made him feel "[v]ery uncomfortable" and he did not "know if he's going to follow through with his threat."  Henricksen testified that immediately before he threw Sadlon on the table and punched him, Sadlon had said, "I'm going to fuck that blonde [(Michelle Easter, who had accompanied Henricksen to the bar)]; if you try to stop me, I'll kill you."  We observe the video shows that just before Henricksen grabbed him, Sadlon had his hands at his sides and was making no move toward Henricksen.

Henrickson acknowledges that "most of the patrons did not see or hear anything that caused them any cause for concern," but he claims "the bar was loud from both the music playing over the speakers and crowd noise, so it was often difficult for patrons to hear others' conversations."  Indeed, no other witness testified to hearing Sadlon threaten Henricksen.  Thomsen's girlfriend, Leah King,

testified Sadlon "was touching [Henricksen] and talking closely," but she did not observe that Sadlon "ever pushed him." Thomsen testified similarly, stating it was "an uncomfortable situation" and Sadlon "was talking very close with [Henricksen]," but he did not believe Sadlon "deserved to be beat up like that." Easter testified Sadlon was "all over the place," "kept going up to [Henricksen] throughout the whole night," and asked Henricksen "if he was a fighter also." Easter stated that Henricksen told her "that [Sadlon] was trying to pick a fight with him." She testified that after the altercation she told another person at the bar that Sadlon was "talking shit, being rude, but he did not deserve that." After the altercation, Henricksen and Easter went to a different bar, where Henricksen told a bartender that Sadlon "got in his face, and he knocked him out." Henricksen told another person at that bar a similar story, and he did not mention that Sadlon had threatened him.

We believe the record before us furnishes substantial proof from which a jury could find, beyond a reasonable doubt, that Henricksen's reliance on the justification defense was unfounded. *See State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993) (noting the jury is free to believe or disbelieve the evidence and to give weight to the evidence as it sees fit). The State refuted the defense with proof that Henricksen initiated the altercation and used unreasonable force against Sadlon. The fact that Henricksen grabbed Sadlon by his coat and threw him, rather than withdrawing or moving to a different location at the bar, substantially weakens any claimed belief in imminent danger of injury or death. We conclude there is sufficient evidence in the record to show the State met its burden to disprove Henricksen's defense of justification, and we affirm on this issue.

Henricksen also contends "the district court should have held a pretrial hearing to determine the merits of [his] claim of statutory immunity." After Henricksen filed his brief, the supreme court addressed and rejected this precise claim. *See State v. Wilson*, 941 N.W.2d 579, 581, 590–91 (Iowa 2020). The court found "that the 2017 legislation does not require pretrial hearings. Significantly, section 704.13 provides an immunity from 'liability,' not an immunity from 'prosecution' as in some other states with stand-your-ground laws." *Id.* at 581 (internal citation omitted). Accordingly, the court determined the defendant "had no right to a pretrial hearing on justification." *Id.* at 590. Because the court's holding in *Wilson* resolves Henricksen's claim, we affirm the district court's denial of his request for a pretrial hearing on statutory immunity.

## IV. *Conclusion*

Having addressed the claims before us, we affirm Henricksen's conviction of murder in the second degree.

**AFFIRMED.**